## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JOSHUA TODD HALE, | ) | CASE NO. 1:25-CV-64 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      INTRODUCTION

The Commissioner of Social Security[1] denied Plaintiff Joshua Todd Hale's application for a period of disability, Disability Insurance Benefits (DIB), and Supplemental Security Income (SSI). Mr. Hale seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated January 14, 2025.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.      PROCEDURAL HISTORY

In August 2022, Mr. Hale applied to the Social Security Administration (SSA) seeking period of disability, DIB, and SSI benefits.[2] (Tr. 194, 201.) He claimed that he became disabled on September 1, 2018. (*Id.*) He identified seven allegedly disabling conditions: (1) "severe ADHD,"

---

[1] Carolyn W. Colvin was serving as Acting Commissioner of Social Security when the complaint was filed. She served in that role until January 2025. A series of acting commissioners led the Agency until May 2025, when Frank Bisignano, the current Commissioner, was confirmed.

[2] The administrative transcript appears at ECF No. 6. I will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 33"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 7") and page-identification numbers (e.g., "PageID# 959").

(2) chronic hemorrhoids, (3) Crohn's disease, (4) "cubital tunnel – right elbow," (5) "knee problems – right knee," (6) anxiety, and (7) depression. (Tr. 240.)

The SSA denied Mr. Hale's application initially and upon reconsideration. (Tr. 63, 75, 98, 110.) Mr. Hale requested a hearing before an administrative law judge (ALJ). (Tr. 142.) His counsel submitted a brief in advance of the hearing. (Tr. 300–04.) The ALJ held a hearing on November 14, 2023, at which Mr. Hale was represented by counsel. (Tr. 38–61.) Mr. Hale testified, as did an independent vocational expert. (*Id.*)

On December 19, 2023, the ALJ issued a written decision finding that Mr. Hale is not disabled. (Tr. 12–33.)

Mr. Hale requested review of the ALJ's decision. (Tr. 192–93.) He filed a brief identifying alleged errors in the ALJ's decision. (Tr. 305–09.) On November 26, 2024, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On January 14, 2025, Mr. Hale filed his Complaint, challenging the Commissioner's final decision that he is not disabled. (ECF No. 1.) Mr. Hale asserts the following assignment of error for review:

> The ALJ failed to identify substantial evidence supporting the RFC finding, excluded limitations from the opinions found persuasive without explanation, and failed to evaluate the medical opinions pursuant [to] the regulations.

(Pl.'s Merit Br. at 11, ECF No. 7, PageID# 959.)

III.     **BACKGROUND**[3]

A.      <u>**Personal, Educational, and Vocational Experience**</u>

Mr. Hale was born in July 1978 and was 44 years old on the date of his application. (*E.g.*, Tr. 194.) He has a GED. (Tr. 44.) He worked part-time as a grill cook from March through at least November 2024. (Tr. 44–45.) He had previously worked as a caretaker at a private home for persons with developmental disabilities, as an employee loading and unloading tires from trucks, and in various short-term or part-time roles over the years. (Tr. 44–47; *see also* Tr. 210–24, 228, 241.)

B.      <u>**Function Report**</u>

Mr. Hale completed a function report on October 21, 2022. (Tr. 248–56.) He wrote that he found it "very hard to focus [his] attention to the task at hand." (Tr. 248.)

Mr. Hale identified that, without medication, he does not handle stress well. (Tr. 254.) He does not handle changes in his routine well, either. (*Id.*) He said he does not like large groups of people because they "give[ him] anxiety." (*Id.*) His conditions affect his memory, understanding, concentration, and his ability to follow instructions and complete tasks. (Tr. 255.) While he follows written instructions "pretty good," he is not as good at following spoken instructions. (*Id.*) He finds that he does not finish what he starts, and his ability to pay attention fluctuates based on what he is paying attention to. (*Id.*) He wrote that he does not get along well with authority figures because he "get[s] frustrated at them." (*Id.*)

Despite these difficulties, Mr. Hale largely reported being able to care for himself. He cooks daily, preferring "healthy meals and not processed food." (Tr. 250.) He does not need special

---

[3] As Mr. Hale's assignment of error is limited to non-exertional limitations stemming from his mental health conditions, I limit my summary of the evidence to that relevant to his mental conditions.

reminders to take medicine or see to his personal needs and grooming; indeed, his conditions have not affected his ability to see to any aspect of his personal care. (*Id.*; *see also* Tr. 251.) He is able to take care of laundry and general cleaning of his residence, albeit sometimes using reminders. (Tr. 250.)

On an average day, Mr. Hale will wake up, eat, take his medicine, make phone calls to see to his affairs (*e.g.,* to doctors, lawyers, and bill collectors), and then help his father. (Tr. 251.) He reads, does "research," listens to podcasts, and engages in outdoor activities like camping and hiking. (Tr. 252.) He is usually able to sleep normally. (Tr. 251.)

Mr. Hale identified that he does things with other people—church activities, eating, playing golf, and going to parties. (Tr. 252.) He goes to church and "ball games" on a regular basis. (*Id.*) He said he has no problems getting along with others, and his conditions have not affected his social activities. (*Id.*)

Mr. Hale is able to go out alone. (Tr. 253.) At the time of the hearing, he was either walking or riding with others because he needed to "pay money to get [his] license back and re-take the driving test." (*Id.*) But he shopped weekly for food, clothing, and other products. (*Id.*) His conditions do not affect his ability to manage his finances. (*Id.*)

C.     **Relevant Hearing Testimony**

1.     *Mr. Hale's Testimony*

Mr. Hale testified that, at the time of his hearing and for around eight months prior, he had been working twenty hours per week as a grill cook at a fast-food restaurant. (Tr. 44–45.) In all that time, he had never needed to take unscheduled breaks, leave early, or arrive late. (Tr. 51.) He reported that he was "doing okay" in that job, describing that he sometimes gets distracted but "it's overall pretty good." (Tr. 47–48.) He said that he would likely have trouble moving to a full-time

4

role at the restaurant, though, because toward the end of his current four- or five-hour shifts he begins to have trouble remembering things and concentrating. (Tr. 48.)

Mr. Hale believes that his ADHD prevents him from working full-time. (Tr. 49–50.) He described getting frustrated with himself, which causes him to feel depressed and anxious. (Tr. 50.)

That said, Mr. Hale said he is "easy going" and "get[s] along with everybody pretty good," even at work. (*Id.*) He finds that his medication is "doing okay" in "leveling [him] out," but he has eight or nine days per month where he feels either pretty depressed or pretty anxious. (*Id.*)

### 2. *Vocational Expert's Testimony*

Edward Steffan testified as a vocational expert (VE) at the hearing. (Tr. 54.) The VE categorized Mr. Hale's past relevant work as that of a nurse assistant (DOT 355.674-014) and a material handler (DOT 929.687-030).

The ALJ then asked the VE to assume that an individual with Mr. Hale's age and education had the ability to perform work at the light exertional level and could work in a job with certain environmental and exertional limitations, along with the following non-exertional limitations:

> [H]e would be able to understand and carry out at least simple tasks in a low stress job, which I would define[] here as one with only occasional decision making or changes in the work setting required[,] that does not involve piece work, fast moving assembly line type work, or strict hourly production requirements. [He would b]e able to work in a job that requires no more than occasional interaction with the public, coworkers, or supervisors after a brief training period.

(Tr. 56–57.)

The VE testified that such a person could not perform Mr. Hale's past relevant work but could perform the work of a mail clerk, housekeeping cleaner, or office helper. (Tr. 57.)

The ALJ asked the VE to assume that the hypothetical person would also be limited to working four to five hours per day. (*Id.*) The VE confirmed that this combination of limitations would be work-preclusive for full-time employment. (Tr. 58.) Similarly, if the person would find

himself off-task for up to 15 percent or more of the time in the last three or four hours of an eight-hour workday, this would be work-preclusive. (*Id.*)

Mr. Hale's counsel asked the VE to consider that person from the ALJ's first hypothetical question also needed an isolated work environment, away from the distractions of others, to maintain attention and concentration. (Tr. 59.) The VE opined that such a limitation would be work-preclusive. (*Id.*)

### D. State Agency Consultants

A disability examiner (Stephanie Mozur), a physician (Elaine Lewis, M.D.), and a psychologist (Deryck Richardson, Ph.D.) reviewed Mr. Hale's claim at the initial review level. (Tr. 63–75.) Dr. Richardson opined that Mr. Hale has a moderate limitation with respect to his ability to understand, remember, or apply information; to interact with others; to concentrate, persist, or maintain pace; and to adapt of manage himself. (Tr. 68.)

Dr. Richardson explained that Mr. Hale's statements in his function report about his mental and social limitations appeared to be "fully consistent" with the objective medical evidence. (Tr. 69.)

In opining on Mr. Hale's mental residual functional capacity, Dr. Richardson found that Mr. Hale had a moderate limitation with respect to his ability to understand and remember detailed instructions but was not significantly limited with respect to his ability to understand "very short and simple instructions." (Tr. 72.) Mr. Hale had moderate limitations with his ability to maintain attention and concentration for extended periods, to work in coordination with or in proximity to others without being distracted by them, to perform activities punctually within a schedule, and to complete a normal workday and workweek without interruptions from psychologically based symptoms. (*Id.*)

6

Dr. Richardson wrote that Mr. Hale had the ability to understand and remember "simple and routine" tasks "in a work environment that does not require a fast pace." (*Id.*) Dr. Richardson further opined that Mr. Hale had a moderate limitation with respect to his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. 73.) In this regard, Dr. Richardson wrote that Mr. Hale retained the ability to "interact with others on a superficial and occasional basis." (Tr. 73.)

Finally, Dr. Richardson opined that Mr. Hale has a moderate limitation with respect to his ability to respond appropriately to changes in his work setting. (*Id.*) Mr. Hale nevertheless maintains the ability to "respond to occasional changes in routine, which are predictable and easily explained." (*Id.*)

Based in part on these conclusions, the consultants found that Mr. Hale was not disabled. (Tr. 75.)

In a letter to Mr. Hale explaining this decision, the SSA wrote that while Mr. Hale's mental health conditions caused him "psychological difficulties" that made it difficult to work, he would be able to perform work that was less mentally demanding. (Tr. 117.)

A disability examiner (Jessica Baldwin), a physician (Paul Wilson, M.D.), and a psychologist (Kristen Haskins, Psy.D.) reviewed Mr. Hale's claim at the reconsideration level. (Tr. 88–98.) Dr. Haskins, in her review, noted that the record showed that Mr. Hale's treatment regimen had been beneficial and that his mental status examinations showed improvement over time. (Tr. 91.) She wrote that the record findings were consistent with a conclusion that his mental health conditions would cause "some limitations" in a work setting. (*Id.*)

In reviewing the mental RFC from the initial level, Dr. Haskins made several additions. Dr. Richardson had opined that Mr. Hale retained the ability to understand and remember simple and routine tasks; Dr. Haskins added a limitation or clarified this opinion by adding a note reading, "1–3 steps." (Tr. 95.) Dr. Richardson had opined that Mr. Hale's work environment should not require a fast pace; Dr. Haskins added that Mr. Hale should "work away from the distractions of others." (Tr. 96.) She concurred that Mr. Hale retained the ability to interact with others "on a superficial and occasional basis." (*Id.*)

Ultimately, the consultants affirmed that Mr. Hale is not disabled. (Tr. 98.)

In a letter to Mr. Hale explaining this decision, the SSA wrote that "exams show that you are able to understand and carry out simple and routine tasks, interact briefly with others, and care for your basic needs." (Tr. 127.)

### E.     **Relevant Medical Evidence**

The record contains a series of medical records relating primarily to Mr. Hale's physical conditions, including but not limited to his nerve, spine, and gastrointestinal conditions. These records include physical examinations, treatment and procedure notes, radiology results, and physical therapy notes, among other things. Because the primary focus of those records is on Mr. Hale's physical conditions, I do not detail them here. However, I note that I have reviewed them. While not as probative to the issues here as the mental health records discussed below, these records reflect that Mr. Hale presented with normal affect, mood, and behavior on examination at those appointments. (*See* Tr. 460, 463–64, 466–67, 469–71, 473, 475, 478, 504, 562, 570, 573, 583, 589, 597.)

Mr. Hale underwent a psychiatric evaluation with Kelly Geyer, a nurse practitioner, on May 20, 2019. (Tr. 879.) Mr. Hale sought treatment for anxiety, depression, and ADHD, and he also sought support to maintain continued sobriety. (*Id.*) He reported that he had been prescribed

medication for ADHD as a child but had not been taking medication for the condition as an adult. (*Id.*) He described symptoms including a racing heart, feeling overwhelmed, being fidgety in social situations, disorganization, procrastination, and feelings of sadness. (*Id.*) He also found himself being irritable. (*Id.*) On examination, Mr. Hale was well-groomed, with clear speech and average eye contact; his behavior was cooperative. (*Id.*) Ms. Geyer noted that Mr. Hale had poor oral hygiene, but she seemed to be referring to his report of a tooth abscess because she also wrote "no hygiene concerns noted." (*Id.*) She prescribed Mr. Hale medication to manage his depression, anxiety, and ADHD. (Tr. 880.)

Mr. Hale followed up with Ms. Geyer on June 18, 2019. (Tr. 663.) The medication he had been prescribed helped manage his anxiety and depression, and he asked for an increased prescription. (*Id.*) He reported that his ADHD medication had also helped, although he still occasionally had trouble completing tasks and often had trouble with organization. (*Id.*) He makes careless mistakes when he finds work boring or repetitive and has some trouble concentrating when people are talking to him. (Tr. 665.) His mental status on examination was within normal limits, although his insight was assessed as "fair." (Tr. 664–65.) He was euthymic with full affect. (Tr. 665.) Ms. Geyer made medication changes and asked Mr. Hale to follow up. (*Id.*)

The medication changes were helpful, as reflected in Ms. Geyer's notes from a July 16, 2019 appointment. (Tr. 668.) Mr. Hale reported improvement in his anxiety symptoms and in his attention, although he found that the ADHD medication started to wear off in the afternoon. (*Id.*) His mental status on examination was largely consistent with his previous appointment, if not a bit better. (Tr. 669–70 ("Insight and judgment fair to good.")) Ms. Geyer increased his ADHD medication dosage. (Tr. 670.)

At a follow-up appointment on August 13, 2019, Mr. Hale reported that he had felt "manic" for two or three days but "feels fine now." (Tr. 673.) Ms. Geyer wrote that this could possibly have been due to his medication changes. (*Id.*) His mental status on examination was consistent with previous appointments, and Ms. Geyer continued him on his medication. (Tr. 674–75.)

Mr. Hale continued to report that his medication was effective at an appointment on September 12, 2019. (Tr. 678.) He said he was "doing well" and sleeping better. (Tr. 680.) His mental status on examination remained consistent. (Tr. 679–80.)

He continued improving through October 2019 (Tr. 683–85) but noticed some increased depression during the winter months of 2019. (Tr. 688, 690.) Ms. Geyer prescribed an antidepressant. (Tr. 690.)

Mr. Hale reported improvement and said he was "doing well" at his appointment in January 2020. (Tr. 693.) He said he would be starting to look for jobs after completing a dental procedure. (*Id.*)

Mr. Hale continued to report stable mental-health symptoms at his February 2020 appointment, although he appeared "somewhat anxious" at the appointment. (Tr. 698.) Ms. Geyer stopped his antidepressant medication, which caused Mr. Hale to feel less anxious but more depressed. (Tr. 703.) In March 2020, Ms. Geyer restarted the antidepressant medication, but at a lower dose. (Tr. 705.)

In April 2020, Mr. Hale's appointments shifted to a mix of in-person and telehealth visits due to the COVID-19 pandemic. (*See, e.g.*, Tr. 708.) At his April 2020 appointment, he reported that he was doing well and had adopted a puppy. (*Id.*) He reported continued stability in May 2020. (Tr. 713.)

At his June 2020 appointment, Mr. Hale admitted that "quarantine" had "gotten to [him] a little," causing him to feel more depressed. (Tr. 336.) Ms. Geyer recommended that Mr. Hale re-engage in counseling, but Mr. Hale declined. (Tr. 338.) Ms. Geyer increased the dosage of his antidepressant medication. (*Id.*)

On July 8, 2020, Mr. Hale reported that the increased dose had helped his depression symptoms; he said he had been "out doing contracting" and was looking for work, which had helped his mood. (Tr. 723.) He had done some roofing work and other "odd jobs." (Tr. 725.)

Mr. Hale reported stable symptoms and said he continued working "outside jobs" and "odds and ends jobs" through August and September, 2020. (Tr. 728, 733.) At an appointment in October 2020, Mr. Hale was maintaining and said that "work [was] going well." (Tr. 738.)

Mr. Hale reported that he was "doing well" at an appointment on November 2, 2020, although he said he had felt "down" on a few occasions. (Tr. 743, 745.) He continued doing well through November and December 2020. (Tr. 748, 753.)

Mr. Hale continued to report stable mental-health symptoms at his appointment on January 18, 2021, although he sometimes felt tired. (Tr. 758, 760.) He remained stable through February (Tr. 763), March (Tr. 768), and April (Tr. 775) 2021. At his May 2021 appointment, he said he was looking forward to returning to work. (Tr. 778.)

Mr. Hale missed appointments in June and July 2021 because he "has been working"; he continued to report stable symptoms at his August 2021 appointment. (Tr. 783.) He said his "attention symptoms, depression and anxiety are under control." (Tr. 785.)

In September 2021, Mr. Hale said he was "hopeful to find a regular job" and was considering going back to school. (Tr. 788.) He remained stable, with controlled symptoms, in October 2021. (Tr. 793.)

Mr. Hale reported some seasonal depression at his appointment in November 2021. (Tr. 798.) But he said he had been "working on cars all morning" and said that he was "doing well." (Tr. 798, 800.)

On December 8, 2021, Mr. Hale said that he was considering going back to work in the new year. (Tr. 803.) He was participating in a holiday theater performance through his church. (Tr. 805.)

Sadly, Mr. Hale's mother passed away suddenly in January 2022. (Tr. 810.) At his January 26, 2022 appointment, Mr. Hale reported feeling overwhelmed and grieving this loss; he reported that he was "doing okay" in the difficult situation, with his medication. (*Id.*)

Mr. Hale continued reporting stable symptoms—albeit with continued grief and some financial concerns—at his February 2022 appointment. (Tr. 815.)

Mr. Hale underwent a psychiatric diagnostic evaluation with Angela Ciroli on April 14, 2022 as part of a transfer of his psychiatric care. (Tr. 883.) Mr. Hale presented with an anxious mood and a constricted affect, but his concentration, behavior, demeanor, and speech were normal. (*Id.*) Mr. Hale said that he had always had "social anxiety." (*Id.*) He said that he did not believe he was capable of working, but he attributed that to physical conditions involving his bowels, neck, and wrists. (Tr. 884.) He was tearful when discussing his mother's passing and said that he had lost weight in the months since that loss. (*Id.*)

Mr. Hale reported significant stress at his appointment in May 2022. (Tr. 818.) He said he was having trouble getting to sleep. (*Id.*) He described financial trouble and said he had experienced what felt like a panic attack when he was informed his electricity would be shut off. (Tr. 818, 820.) Ms. Ciroli made medication changes. (Tr. 820.)

Mr. Hale reported some improvement at his June 2022 appointment, although he complained of low motivation and some stress related to food security. (Tr. 824, 826.)

Mr. Hale presented to his August 2022 appointment with poor hygiene; he said he had been struggling with focus and increased depression and tearfulness. (Tr. 829.) He described mood swings, crying "out of the blue," and struggling with grief. (Tr. 831.) Ms. Ciroli recommended counseling, but Mr. Hale declined. (*Id.*) Ms. Ciroli made medication changes. (*Id.*)

At his appointment on September 16, 2022, Mr. Hale said that he was "doing alright" and adjusting to his medication changes. (Tr. 834.) He said the medication was helping stabilize his mood and that he was thinking more clearly and was less anxious. (*Id.*) He reported that he was looking for employment. (Tr. 836.)

Mr. Hale continued to report that his medication was working in October 2022, although he was sad at having to re-home his dog during a move. (Tr. 839.) Mr. Hale presented to the appointment with largely normal mental status, although he had poor hygiene and an anxious mood and affect. (Tr. 841.) Ms. Ciroli made certain medication changes. (*Id.*)

Mr. Hale was fully moved into his new residence by November 28, 2022. (Tr. 844.) He said he was doing better since the move. (*Id.*) He said he was "finally feeling good" and presented with a noticeably "brighter affect." (Tr. 846.)

At his appointment on December 29, 2022, Mr. Hale said that he had been worried about depression around the Christmas holiday, but that he had gotten through it "ok so far." (Tr. 849.) He said he had been doing "very well" with his mental health symptoms, participated in church activities, spent time with family, and was looking to donate blood plasma. (Tr. 851.)

Mr. Hale underwent a disability evaluation on January 6, 2023. (Tr. 638.) The examination was largely focused on his physical conditions, although Mr. Hale reported that he had struggled

with ADHD symptoms for 30 years, including having difficulty finishing tasks. (*Id.*) He said his medication helped "somewhat." (*Id.*)

Mr. Hale continued to report stable symptoms at his appointment with Ms. Ciroli on February 9, 2023. (Tr. 854, 856.)

At his April 10, 2023 appointment, Mr. Hale said that he had started working at a fast-food restaurant and had felt less depressed since working. (Tr. 859.) He was working 20 to 25 hours per week; he sometimes felt overwhelmed but "has been keeping up with the pace well." (Tr. 861.)

Mr. Hale remained stable through May 2023. (Tr. 864.) He said he felt some anxiety at work but was proud to be doing something outside of his "comfort zone." (Tr. 866.)

Mr. Hale was stable as of July 2023, too. (Tr. 869.) He presented with anxious mood and affect, though, and said that he did not like to go to the grocery store due to social anxiety. (Tr. 871.)

At his September 2023 appointment, Mr. Hale reported that his mood was stable and said he was managing his part-time work at the restaurant well. (Tr. 874.) Ms. Ciroli suggested that Mr. Hale consider weaning off some of his medication due to his stability. (Tr. 876.)

## IV.    THE ALJ'S DECISION

The ALJ determined that Mr. Hale met the insured status requirements for period of disability and DIB through December 31, 2023. (Tr. 17.) The ALJ further determined that Mr. Hale had not engaged in substantial gainful activity since September 1, 2018, the alleged disability onset date. (*Id.*)

The ALJ next determined that Mr. Hale had the following severe impairments: (1) depression; (2) anxiety; (3) attention-deficit/hyperactivity disorder (ADHD); (4) disorders of the skeletal spine; (5) cubital tunnel syndrome; (6) disorders of the gastrointestinal system; and (7) hemolytic anemia. (Tr. 18.)

The ALJ then concluded that none of Mr. Hale's impairments, whether considered singly

or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

In explaining this conclusion, the ALJ wrote that Mr. Hale had not more than a moderate limitation with respect to his ability to understand, remember, or apply information, pointing out that Mr. Hale denied needing reminders, was able to manage his money, and said he followed written instructions pretty well. (Tr. 19.) The ALJ further reasoned that the record showed Mr. Hale went shopping, worked part time and performed odd jobs, worked on cars, read, he did research, prepared meals, and did laundry. (*Id.*)

The ALJ further concluded that Mr. Hale had no more than a moderate limitation with respect to his ability to interact with others, noting that Mr. Hale denied he had problems getting along with family, friends, and neighbors; went to baseball games; spent time with others; had friends; and went to stores. (*Id.*) The ALJ pointed out that Mr. Hale denied he had problems getting along with others at work and, on examination, often presented as cooperative and pleasant with normal behavior (*Id.*)

The ALJ determined that Mr. Hale had the residual functional capacity ("RFC") to perform work at the light exertional level, with some additional environmental, exertional, and non-exertional limitations. (Tr. 19.)

With respect to exertional and environmental limitations, the ALJ concluded that Mr. Hale was further limited as follows:

> [He] cannot climb ladders, ropes, or scaffolds. [He] can occasionally climb ramps and stairs, balance, stoop, crouch, kneel, and crawl. [He] must avoid concentrated exposure to vibration/vibratory tools, moving machinery, and unprotected heights. [He] is able to engage in frequent handling and fingering with the right (dominant) hand with no restrictions on the left hand.

(Tr. 21.)

15

With respect to non-exertional limitations, the ALJ concluded that Mr. Hale was further limited as follows:

> [He] is able to understand and carry out at least simple tasks in a low stress job, defined as one with only occasional decision making or changes in the work setting required, that does not involve piece work, fast-moving assembly line-type work, or strict hourly production requirements. He is able to work in a job that requires no more than occasional interaction with the public, co-workers, and supervisors after a brief training period.

(*Id.*)

The ALJ found that Mr. Hale was 40 years old on the alleged disability onset date and had at least a high school education, but he could not perform his past relevant work as a nurse assistant or material handler. (Tr. 31–32.)

The ALJ then determined that—considering Mr. Hale's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that he could perform, including work as a "mail clerk" (DOT 209.687-026), "cleaner, housekeeper" (DOT 323.687-014), or "office helper" (DOT 239.567-010). (Tr. 32–33.)

Accordingly, the ALJ determined that Mr. Hale is not disabled. (Tr. 33.)

## V.    LAW & ANALYSIS

### A.    <u>Standard of Review</u>

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v.*

16

*NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.   Standard for Disability

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or

mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially

when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

C.    **Analysis**

In his assignment of error, Mr. Hale contends that the ALJ erred when he crafted an RFC that did not incorporate limitations "regarding working away from distractions, interacting on a superficial basis, and predictable and easily explained changes in routine." (Pl.'s Br., ECF No. 7, PageID# 962.) He argues that the ALJ's explanation for omitting these limitations—that he was not "adopting the limitations [as opined by the administrative medical consultants] verbatim in order to put limits in more vocationally relevant terms" (Tr. 31)—was not a valid reason. (ECF No. 7, PageID# 962.)

Mr. Hale further argues that the ALJ's limitation to "simple" tasks did not adequately account for the agency consultant's opinion that Mr. Hale was limited to one- to three-step tasks. (*Id.* at PageID# 963.)

He next argues that the ALJ did not adequately explain why he concluded that Mr. Hale could have more than occasional interaction with others during a training period. (*Id.* at PageID# 964.)

Finally, he argues that the ALJ relied too heavily on normal mental status examination findings while ignoring those instances where findings were abnormal. (*Id.* at PageID# 967–68.)

19

The Commissioner defends the ALJ's decision as a thorough discussion of the objective evidence and prior administrative findings. (Opp'n Br., ECF No. 9, PageID# 977.) The Commissioner argues that the ALJ adequately explained why he limited Mr. Hale only to "simple" tasks, including by pointing out that Mr. Hale reported that he could follow written instructions "pretty good." (*Id.* (citing Tr. 22)). Further, the Commissioner points out that the ALJ noted that Mr. Hale had been working at a fast-food restaurant for 20 to 25 hours per week. (*Id.* at PageID# 978 (citing Tr. 28)). With respect to the ALJ's decision not to incorporate a superficial-interaction limitation, the Commissioner asks the Court to read "the decision as a whole and with common sense," insisting that there is "ample evidence . . . for not adopting a limitation to superficial interaction and for allowing [Mr. Hale] additional social interaction during a brief training period." (*Id.* at PageID# 978–79.) Finally, the Commissioner argues that the ALJ reasonably explained why he did not limit Mr. Hale to a work environment away from the distractions of others. (*Id.* at PageID# 979.)

In reply, Mr. Hale reiterates his argument that the ALJ "cherry-picked" normal examination findings to support the RFC while ignoring supportive findings in the treatment notes. (Reply, ECF No. 10, PageID# 982.)

After careful consideration, I agree with the Commissioner. Reading the ALJ's opinion as a whole and with common sense, especially considering the arguments made before the agency, the ALJ adequately explained his RFC and the RFC was supported by sufficient evidence.

As an initial matter, Mr. Hale is incorrect about the reason the ALJ did not include a limitation regarding working away from distractions. The ALJ found the state agency psychiatric consultants' opinions "mostly persuasive." (Tr. 31.) The ALJ noted that the consultants' opinions were based on a detailed review and explanation of the record evidence. (*Id.*) Then the ALJ

specifically explained his conclusion that "the record did not support [that] the claimant had to work away from the distractions of others," reasoning that the Mr. Hale denied he had problems getting along with family, friends, and neighbors; went to baseball games; spent time with others; had friends; went to stores; and denied he had problems getting along with others at work. (*Id.*) The ALJ further pointed out that Mr. Hale's mental status exams often showed him as cooperative, pleasant, and exhibiting normal behavior, attention, and concentration. (*Id.*)

I further agree with the Commissioner that the ALJ thoroughly and accurately summarized the record. There was no cherry-picking here, contrary to Mr. Hale's argument. Indeed, the ALJ acknowledged Mr. Hale's testimony about his symptoms, his description of his limitations, and those places where the medical records and medical opinions support finding some limitations as a result of his mental-health conditions. And the ALJ then accurately summarized Mr. Hale's treatment record. (*See* Tr. 26–28.)

Having disposed of these issues, I turn to Mr. Hale's arguments with respect to the ALJ's other non-exertional limitations—his decision not to limit Mr. Hale to "superficial" interactions and his decision to limit Mr. Hale to "simple" tasks, as opposed to "one- to three-step tasks." Here, I agree that the ALJ's reasoning with respect to Mr. Hale's social-interaction and task limitations could have been more clearly explained as a matter of best practice, but I ultimately find that the ALJ's decision—read as a whole and with common sense—is legally and adequately stated and supported by sufficient evidence.

As discussed further above, both Dr. Richardson and Dr. Haskins opined that Mr. Hale retained the ability to "interact with others on a superficial and occasional basis." (Tr. 73, 96.) And while Dr. Richardson had opined that Mr. Hale retained the ability to understand and remember

21

simple and routine tasks, Dr. Haskins added a limitation or clarified this opinion by adding a note reading, "1–3 steps." (Tr. 95.)

The ALJ found these opinions to be mostly persuasive, reasoning that "they were highly consistent with the evidence that was available at the time they were completed." (Tr. 31.) Nevertheless, the ALJ stated that he was not "adopting the limitations verbatim in order to put limits in more vocationally relevant terms." (*Id.*)

Even where an ALJ provides "great weight" to a medical opinion, there is no requirement that an ALJ adopt the verbatim language of that opinion. *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (noting that an ALJ is not required to adopt each restriction of an expert to which he gave great weight); *Jordan v. Comm'r of Soc. Sec.*, No. 5:17-cv-02466, 2018 WL 5884830, at *10 (N.D. Ohio Nov. 9, 2018) ("Jordan's contention that the ALJ's RFC is not supported by substantial evidence because it does not include each and every limitation contained in the medical opinions that were assigned 'weight' is unavailing"); *cf. Calzo v. Saul*, No. 4:19CV00598, 2020 WL 2362057, at *6 (N.D. Ohio Feb. 4, 2020), *report and recommendation adopted*, 2020 WL 1041213 (holding that ALJ did not err in failing to include limitations identified by state agency psychologists because "[t]he ALJ's RFC finding does not outright *contradict* the State agency opinions, but rather, it simply *omits* the specific limitation about which they opined").

Here, with respect to social-interaction limitations, the ALJ specifically stated that an "occasional" limitation—that is to say, without the recommended accompanying "superficial" limitation—"reasonably accommodates the claimant's difficultly interacting with others." (*See* Tr. 29.) While the ALJ could have more clearly explained why he excluded the "superficial" limitation, his reasoning is readily apparent: the ALJ repeated at several points in his decision that Mr. Hale denied he had problems getting along with family, friends, and neighbors; went to

baseball games; spent time with others; had friends; and went to stores. (*E.g.*, Tr. 19.) The ALJ further pointed out that Mr. Hale denied he had problems getting along with others at work and, on examination, often presented as cooperative and pleasant with normal behavior (*Id.*)

Read in its proper context, the ALJ's clear statement that an "occasional" limitation adequately accounts for Mr. Hale's moderate limitation in the ability to interact with others, is reasonable and distinguishes this case from those cases in which an ALJ plainly fails to account for an opined "superficial" limitation. *See Lindsey v. Comm'r of Soc. Sec.*, No. 2:18-cv-18, 2018 WL 6257432, *4 (S.D. Ohio Nov. 30, 2018); *Hummel v. Comm'r of Soc. Sec.*, No. 2:18-cv-28, 2020 WL 13572215, *4 (S.D. Ohio Mar. 13, 2020).

The ALJ's reliance on undisputed evidence in the record to support this conclusion, similarly, distinguishes this case from those cases in which an ALJ omitted a recommended "superficial" limitation without explanation or based on a legally insufficient rationale. *See Kinney v. Comm'r of Soc. Sec.*, No. 23-3889, 2024 WL 2273365, * 2–3 (6th Cir. May 20, 2024); *Lindsey v. Comm'r of Soc. Sec.*, No. 2:18-cv-18, 2018 WL 6257432, *4 (S.D. Ohio Nov. 30, 2018); *Clampit v. Comm'r of Soc. Sec.*, No. 3:20-cv-1014, 2021 WL 3174111, *2 (N.D. Ohio July 26, 2021); *Hummel v. Comm'r of Soc. Sec.*, No. 2:18-cv-28, 2020 WL 13572215, *4 (S.D. Ohio Mar. 13, 2020).

I am similarly unconvinced by Mr. Hale's argument that the ALJ failed to include or explain his omission of Dr. Haskin's note reading, "1–3 steps." (*See* Tr. 95.) Courts have dealt differently in distinguishing—in context—between "simple" tasks and one or two step tasks. *See   O'Neil v. Comm'r of Soc. Sec.*, No. 2:19-CV-2966, 2020 WL 415611, at *3 (S.D. Ohio) (evaluating ALJ's discussion of the difference between simple and 1–2 step tasks); *Hall v. Comm'r of Soc. Sec.*, No. 1:17-CV-363, 2018 WL 3524467, at *3 (S.D. Ohio) (discussing medical report that distinguished

between simple and up to three-step tasks); *but see Smith v. Comm'r of Soc. Sec.*, No. 1:20-CV-1366, 2021 WL 3566695, at *5 (N.D. Ohio) (Parker, M.J.) (reviewing medical report limiting plaintiff to "one-step simple tasks"); *Lonaker v. Astrue*, No. CIV.A. 11-383-HRW, 2013 WL 663577, at *4 (E.D. Ky.) (discussing a plaintiff's ability to complete "simple one and two-step tasks").

Here, though, Mr. Hale does not convince me that he is capable of only one- to three-step tasks or that he would be incapable of performing the jobs the ALJ stated existed in the national economy for a person with his residual functional capacity. Again, the ALJ repeated throughout his opinion that Mr. Hale denied he had problems getting along with family, friends, and neighbors; went to baseball games; spent time with others; had friends; and went to stores. (*E.g.*, Tr. 19.) The ALJ further pointed out that Mr. Hale denied he had problems getting along with others at work and, on examination, often presented as cooperative and pleasant with normal behavior (*Id.*)

Read in their proper context, the ALJ's clear statements that an "occasional" limitation and a limitation to "simple" tasks adequately account for Mr. Hale's moderate non-exertional limitations.

Before concluding, I point out that the ALJ wrote his decision in the context of the record and argument presented before the agency. Mr. Hale, in his brief to ALJ, focused almost exclusively on his physical (that is to say, exertional) limitations. (*See* Tr. 300–04) (focusing on Mr. Hale's physical conditions but discussing, without significant citation to the record, that Mr. Hale suffers from "multiple psychological conditions . . . [and] is unable to exhibit the sustained concentration, persistence, and pace" for competitive employment"). In appealing the ALJ's decision, Mr. Hale also focused his argument almost exclusively on his physical (that is to say, exertional) limitations. (*See* Tr. 305–09.)

24

I state these observations solely to point out that, while the ALJ could have—as a matter of best practice—done a better job of explaining why he did not incorporate certain non-exertional limitations opined by the state agency consultants, the ALJ's decision is legally adequate when read in its entirety and with common sense, as the Commissioner suggests.

Stated another way, I am convinced that the ALJ built a logical bridge explaining, in light of the record evidence, why he chose not to include the superficial limitation or specific task-step limitation recommended by the state agency psychological consultants. A reviewing court must read the ALJ's decision as a whole, *see Taylor v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, *8 (N.D. Ohio Sept. 30, 2021), and here the decision clearly enables me to trace the ALJ's reasoning on these issues.

## VI.   RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated:  September 8, 2025                    /s *Jennifer Dowdell Armstrong*
                                                              Jennifer Dowdell Armstrong
                                                              U.S. Magistrate Judge


## VII.   NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which

objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).